IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FELIX SOLORIO VALDOVINOS,

      Petitioner,

     v.

ROBERT HOREL,

      Respondent.

_____/

No. C 02-1704 CW

ORDER DENYING
PETITION FOR WRIT
OF HABEAS CORPUS

On April 10, 2002, Petitioner Felix Solorio Valdovinos, an inmate at Pelican Bay State Prison located in Crescent City, California, filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the validity of his state conviction and sentence. Respondent Warden Robert Horel filed an answer to the petition acknowledging that the petition was timely and that all claims raised had been exhausted.[1] Subsequently, this Court appointed counsel to represent Petitioner. Upon appointment, Petitioner's counsel filed a timely traverse. Respondent filed a motion to dismiss on the grounds that the traverse referred to new

_____

[1]The Court notes that the caption in the docket indicates that Joe McGrath is the named Defendant in his capacity as warden of Pelican Bay State Prison (PBSP). The Clerk of the Court shall substitute Robert Horel as warden of PBSP. See Rule 25(d)(1) of the Federal Rules of Civil Procedure (if a public officer who is a party to a lawsuit ceases to hold office or resigns, the officer's successor is automatically substituted as a party).

facts and new legal theories and, thus, contained unexhausted claims such that the petition must be dismissed.  On December 3, 2004, the Court issued an order ruling that three claims presented in the traverse were unexhausted and staying the proceedings to allow Petitioner to exhaust these claims in state court. Petitioner did so and filed a motion to lift the stay and amend the petition to add his newly exhausted claims.  On March 20, 2007, the Court issued an order granting the motion to lift the stay and amend the petition.  On October 10, 2007, Respondent filed an answer to the new petition and on November 12, 2007, Petitioner filed his reply.  Having considered all of the papers filed by the parties, the Court DENIES the petition for writ of habeas corpus.

STATEMENT OF FACTS

The following facts are taken from the Court's December 3, 2004 Order.  On May 11, 1998, at about 1 a.m., Nelson Caballero was shot to death outside a San Jose nightclub.  Caballero had been conversing with a man outside the nightclub when the man fired two shots, both at close range, and both from a .380 caliber semi-automatic handgun.  One shot was to Caballero's stomach and the other was to his head.  The coroner determined that Caballero was killed by the combination of the two gunshot wounds.  Petitioner was ultimately charged with the murder.

At the preliminary hearing and at trial, the prosecution called four acquaintances of Caballero who were with him at the

2

time of the shooting: Joaquin Diaz[2], Tracy Castro, Kyong "Say" Miranda, and Caballero's girlfriend, Blanca Torres. The first three witnesses identified Petitioner as the killer at the preliminary hearing and at trial. Torres was unable to do so.

At both the preliminary hearing and the trial, Diaz testified that he was standing outside the club with Caballero when another acquaintance, Shalaman[3], joined them. Shalaman pointed to three men coming out of the bar and said they would shoot him if they saw him. Caballero offered to "back up" Shalaman. The three men, who were strangers to Diaz, approached Caballero, Diaz, and Shalaman. The man who would shoot Caballero wore a black cowboy hat, a black leather jacket, and a mustache. He was about as tall or a little shorter than Diaz, who stood five feet six inches. One of the shooter's companions was also dressed "cowboy style" like the shooter and wore a hat; however, he was taller than Diaz. The third man wore no hat, was not dressed "cowboy style" and was Diaz's height. Diaz identified Petitioner as the shooter by pointing to him at the defense table.

According to Diaz, the shooter and Caballero suggested they fight. Diaz then focused his attention on Caballero who proceeded to unbutton his jacket. As Caballero was unbuttoning his jacket Diaz heard a shot, turned, and saw Petitioner holding a handgun and shooting Caballero. When Caballero fell from the first shot,

---

[2] At trial, Diaz was impeached with a 1996 felony conviction involving moral turpitude and a previous conviction for threatening or dissuading a witness.

[3] The record does not contain the full name of this individual.

3

Petitioner walked over to Caballero, shot him again, and then quickly walked away. Petitioner's two companions took off running.

Also present outside the nightclub were Castro and Miranda. At trial, Castro testified that she knew Caballero as a friend from the club, and that when she exited the club that night, she saw Caballero talking to a man. The two men were standing with a group of men approximately twenty-five feet away from Castro. Castro did not know the man with whom Caballero was speaking, but said she was positive he was six feet tall and wore a white cowboy hat, jeans, and a black waist-length jacket. Castro testified that she observed the man shoot Caballero in the stomach and then in the temple. After the shooting, Castro saw the shooter leave with another person in a gray car. At both the trial and the preliminary hearing, Castro identified Petitioner as the man who shot Caballero.

At trial, Miranda testified to the following: she was two or three feet behind Castro as they left the club, and she heard a gunshot and saw smoke but did not actually see a gun. Miranda described the shooter as a Hispanic male wearing a light tan straw cowboy hat, a short leather jacket and denim. She said he was tall, on the slender side, and wore a mustache. Miranda identified Petitioner as the shooter at both the preliminary hearing and trial. She testified that Petitioner, accompanied by a male passenger, drove away from the scene in a gray car.

Torres testified at trial that when Caballero was shot, she was sitting in the driver's seat of her car approximately twenty to twenty-five feet away from him. Torres had previously seen

4

Caballero conversing with four men, two of whom she recognized as Triste[4] and Shalaman, persons she had met at the nightclub. After she heard a "pop," Torres turned and saw Caballero grab his stomach and fall to the ground. At this point, Torres saw only one person, a Hispanic male, standing over Caballero. The man shot Caballero again and then ran past Torres. Torres could not identify the man, but she told the police he was wearing a black hat, a dark jacket, was a bit muscular, and had a mustache.

In addition to Caballero's acquaintances, the prosecution called Isidro Garcia, and read into the record the preliminary hearing testimony and unsworn police statement of Aurelio Lopez. Both Garcia and Lopez lived with Petitioner, and Lopez was also Petitioner's cousin.

Garcia and Lopez were at the club on the night of the shooting. Lopez was dressed like Petitioner. Lopez was wearing a gray cowboy hat, a black leather jacket and boots. Garcia was wearing a black leather jacket, black pants, and boots, but no hat. Garcia and Lopez were leaving the club when Caballero was shot. Both Lopez and Garcia claimed to have heard two shots and to have seen Caballero on the ground. Both men testified that they did not see who fired the shots and did not see Petitioner. After the shooting, Garcia and Lopez got into their car and drove home.

Detective Ernesto Alcantar and Police Sergeant Pete Ramirez investigated the murder. On May 15, 1998, Detective Alcantar showed Castro a six-person photographic lineup. All of the

---

[4] The record does not contain the full name of this individual.

pictures depicted Hispanic males with mustaches and short to medium black hair. Castro did not identify Petitioner but selected another photograph. About a week after the shooting, Diaz viewed the lineup. Diaz chose Petitioner but qualified his choice by saying that he was not sure.

Also on May 15, 1998, Detective Alcantar and Sergeant Ramirez went to Petitioner's apartment looking for him. He was not there but Garcia and Lopez were. The police received consent to search the residence and found an ounce of methamphetamine and a 9-millimeter gun in Lopez's bedroom. Lopez was arrested on an outstanding warrant for gun and drug possession, and for the gun and drugs found in his room. Lopez was not charged with the latter crimes.

The same day, the detectives interviewed Lopez and Garcia at the police station. When asked if he saw Petitioner with a weapon on the night of the shooting, Lopez said he did but did not know what kind. When questioned further, Lopez stated that the weapon he saw Petitioner with was a gun.

At the preliminary hearing, Lopez admitted that he told Detective Alcantar that Petitioner had a gun, but testified that his statements to Detective Alcantar were not truthful. He explained that he told Detective Alcantar what he wanted to hear because he was afraid to do otherwise. Lopez said he was afraid that he himself might be a suspect. Lopez testified at the preliminary hearing that although the police did not say they would implicate him if he did not talk, they treated him badly before he gave his statement.

During Garcia's interview with Detective Alcantar, Garcia lied and said he had not been at the club and had not seen Petitioner. At trial, Garcia said he lied because Detective Alcantar was verbally abusing him. He testified that he started telling the truth after Detective Alcantar said that Lopez was telling a different story. Garcia said that he was outside the bar during the shooting and that Lopez was wearing a gray hat like Petitioner.

On August 19, 1998, and August 20, 1998, respectively, Detective Alcantar showed Castro and Diaz a second photographic lineup using a different photograph of Petitioner. Again, Diaz chose Petitioner's photo but said he was not sure and Castro identified someone other than Petitioner. Detective Alcantar did not include a photograph of Lopez in either lineup although at trial he testified that Lopez was similar in size and stature to Petitioner.

At the preliminary hearing on August 25, 1998, Petitioner's defense attorney, in the presence of the prosecutor and Detective Alcantar, requested a "blackboard preliminary"[5] hearing based on a review of the police reports which indicated that the witnesses were never presented with a lineup or photo lineup. Although photo lineups had been conducted, both the prosecutor and Detective Alcantar stood silent when the defense told the court there had been no prior identification. The court denied the defense attorney's request for a blackboard preliminary hearing. At the

---

[5] In a "blackboard preliminary" a screen of some sort is placed between the defendant and any witness so as to prevent the witness from seeing the defendant.

7

1  hearing, Diaz, Castro and Miranda identified Petitioner as the

2  shooter.

3       On the second day of trial, during his cross-examination of

4  Diaz, defense counsel first discovered that a photographic lineup

5  had been conducted.  Diaz's testimony was confirmed by the cross-

6  examination of Detective Alcantar, who admitted that he had

7  administered two separate photographic lineups.

8       Based on the newly discovered information, defense counsel

9  moved for a dismissal, arguing that the prosecution's failure to

10 provide information regarding the misidentification and tenuous

11 identification of the shooter in the photo lineups substantially

12 changed the way counsel would have handled the preliminary

13 examination and argued the case at trial.  The trial court

14 determined that the material was exculpatory material which should

15 have been turned over to the defense in accordance with <u>Brady v.</u>

16 <u>Maryland</u>, 373 U.S. 83 (1963) (holding that suppression by

17 prosecution of evidence favorable to an accused upon request

18 violates due process where evidence is material either to guilt or

19 to punishment).  However, the court denied the motion to dismiss

20 because it found that the prosecution did not intentionally conceal

21 the exculpatory evidence and therefore did not act in bad faith.

22 To remedy the <u>Brady</u> violation, the court offered defense counsel a

23 continuance and read to the jury California Criminal Jury

24 Instruction number 2.28.[6]  Defense counsel declined the offer of a

25 _____

26      [6] The court read the following to the jury:

27          The prosecution and the defense are required to
            disclose to each other before trial the evidence each

28                                8

continuance.

In addition to withholding evidence related to the identification of Petitioner, the prosecution failed to disclose evidence that defense counsel alleged could be used to impeach Lopez. The prosecutor did not disclose to Petitioner's attorney before the preliminary hearing that, when arrested, Lopez was found to be in the possession of a handgun and an ounce of methamphetamine. Defense counsel learned of the gun and drugs during his cross-examination of Detective Alcantar. Detective Alcantar testified that the information regarding Lopez was not disclosed because Lopez's arrest was considered to be unrelated to

**United States District Court**
For the Northern District of California

---

intends to present at trial so as to promote the ascertainment of the truth, save court time, and avoid any surprise which may arise during the course of the trial. Concealment of evidence and/or delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena the noncomplying party's evidence.

Disclosures of evidence are required to be made at least thirty days in advance of trial. Any new evidence discovered within thirty days of trial must be disclosed immediately. In this case, the People concealed and/or failed to timely disclose the following evidence: Photo lineups shown to the following witnesses. One, Joaquin Dias, and two, Tracy Castro, and the results thereof.

Although the People's concealment and/or failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during trial. The weight and significance of any concealment and/or delay and disclosure are matters for your consideration. However, you should consider whether the sealed and/or untimely disclosed evidence pertains to a fact of importance, something trivial, or subject matter already established by other credible evidence.

RT at 324-25.

1  the shooting.

2      Lopez was scheduled to testify for the prosecution at trial,

3  but he absconded.  Due to his unavailability, the prosecution

4  requested that the trial court admit Lopez's preliminary hearing

5  testimony in which he mentioned his post-arrest statement to

6  Detective Alcantar that Petitioner had a gun the night of the

7  murder.  The trial court granted the prosecution's request over

8  defense counsel's objection to Lopez being declared unavailable.

9  The prosecution also read into the record Lopez's unsworn post-

10 arrest statement to police that Petitioner had a gun the night of

11 the murder.  Defense counsel did not object to the admission of

12 Lopez's out-of-court statement.

13     Based on his untimely discovery of favorable evidence, defense

14 counsel moved for a mistrial, arguing that Lopez's possession of

15 the gun and drugs could have been used to impeach his testimony at

16 the preliminary hearing and that, without this evidence, counsel

17 had been unable effectively to cross-examine Lopez at the

18 preliminary hearing.  The request for a mistrial was denied.  The

19 trial court found that the prejudicial impact of the untimely

20 disclosure did not warrant a mistrial.  The court, however,

21 suggested that another remedy might be available.  Petitioner's

22 attorney chose not to pursue an alternative remedy.

23                    PROCEDURAL BACKGROUND

24     On December 1, 1998, after a seven day trial, the jury

25 convicted Petitioner of first degree murder and found that in

26 committing the crime he used a firearm and proximately caused great

27 bodily injury to the victim by discharging the firearm.  On January

28

                              10

8, 1999, Petitioner was sentenced to a prison term of fifty years
to life.

On appeal to the California court of appeal, Petitioner argued
(1) the trial court erred in admitting Lopez's preliminary hearing
testimony because the prosecution's failure to disclose until trial
that the police had found a gun and drugs in Lopez's room prevented
Petitioner from having a meaningful opportunity to cross-examine
Lopez at the preliminary hearing in violation of the Confrontation
Clause; (2) the prosecution's untimely disclosure of exculpatory
evidence, i.e. the photographic line-ups, was contrary to <u>Brady</u> and
violated due process; and (3) the trial court erred when it failed
to answer a jury question critical to the determination of whether
the charged homicide was murder in the first or second degree.

On August 23, 2000, in an unpublished opinion, the California
court of appeal rejected Petitioner's claims and affirmed the
judgment. <u>See</u> <u>People v. Valdovinos</u>, HO19599 (Ct. App. August 23,
2000).

Petitioner did not seek direct review of the appellate
decision, but filed a pro se petition for a writ of habeas corpus
in the California Supreme Court on June 29, 2001. (Cal., S098707.)
Petitioner presented five claims to the California Supreme Court:
(1) Sixth Amendment Confrontation Clause violation based on
admission of witness' preliminary hearing testimony;
(2) Confrontation Clause based on admission of unavailable witness'
out-of-court statement; (3) due process violation based on
impermissibly suggestive pretrial photographic identification;
(4) <u>Brady</u> violation based on prosecutor's nondisclosure of

11

exculpatory evidence; and (5) ineffective assistance of counsel.

Petitioner requested an evidentiary hearing and the appointment of counsel; both of his requests were denied. On December 19, 2001, the Supreme Court rejected Petitioner's State habeas corpus petition without citation or comment. On April 10, 2002, Petitioner filed a pro se petition for federal habeas corpus relief. The federal habeas corpus petition alleged all of Petitioner's state habeas claims. On August 29, 2002, Respondent filed an answer to the petition and acknowledged that Petitioner had exhausted his state remedies, having presented to the California Supreme Court the claims raised in his federal petition. After counsel was appointed to represent Petitioner, he filed a traverse which contained the following unexhausted claims: (1) ineffective assistance of counsel based on counsel's failure to object to the admission of Lopez's out-of-court police statement and failure to seek a continuance; (2) <u>Brady</u> claim based on newly discovered evidence; and (3) <u>Youngblood</u> claim based on the theory that the prosecution, in bad faith, destroyed material, exculpatory evidence. Petitioner brought these claims in a habeas petition to the California Supreme Court, which denied them without comment. The Court now addresses all of Petitioner's claims.

LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In any event, habeas relief is warranted only if the constitutional error at issue is structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000); Alvarado v. Hill, 252 F.3d 1066, 1068-69 (9th Cir. 2001). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Williams, 529 U.S. at 412. A state court decision may no longer be overturned on habeas review simply because of a conflict with circuit-based law. Van Tran v. Lindsey, 212 F.3d 1143, 1154 (9th Cir.), overruled on other grounds in Lockyer v. Andrade, 123 S. Ct. 1166 (2003). Nonetheless, circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Id.; Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

"Under the 'contrary to' clause, a federal habeas court may

13

grant the writ if the State court arrives at a conclusion opposite

to that reached by this Court on a question of law or if the State

court decides a case differently than this Court has on a set of

materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413.

As summarized by the Ninth Circuit: "A state court's decision can

be 'contrary to' federal law either 1) if it fails to apply the

correct controlling authority, or 2) if it applies the controlling

authority to a case involving facts 'materially indistinguishable'

from those in a controlling case, but nonetheless reaches a

different result." <u>Van Tran</u>, 212 F.3d at 1150 (citing <u>Williams</u>,

529 U.S. at 405-07).

"Under the 'unreasonable application' clause, a federal habeas

court may grant the writ if the State court identifies the correct

governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's

case." <u>Williams</u>, 529 U.S. at 412-13.

Under 28 U.S.C. § 2254(d)(2), a federal habeas court may grant

the writ if it concludes that the state court's adjudication of the

claim resulted in a decision that "was based on an unreasonable

determination of the facts in light of the evidence presented in

the State court proceeding." <u>Torres v. Prunty</u>, 223 F.3d 1103, 1107

(9th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2) and <u>Williams</u>, 529

U.S. at 412-13). The "clearly erroneous" standard of

unreasonableness that applies in determining the "unreasonable

application" of federal law under § 2254(d)(1) also applies in

determining the "unreasonable determination of the facts in light

of the evidence" under § 2254(d)(2). <u>Id.</u> at 1107-08 (citing <u>Van</u>

United States District Court

For the Northern District of California

<u>Tran</u>, 212 F.3d at 1153-54). To grant relief under § 2254(d)(2), a federal court must be "left with a firm conviction that the determination made by the state court was wrong and that the one [petitioner] urges was correct." <u>Id.</u> at 1108 (quoting <u>Van Tran</u>, 212 F.3d at 1153-54) (internal quotation marks omitted). A district court must presume correct any determination of a factual issue made by a State court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In determining whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>LaJoie v. Thompson</u>, 201 F.3d 1166, 1172 n.9 (9th Cir. 2000). If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. <u>Lockhart v. Terhune</u>, 250 F.3d 1223, 1230 (9th Cir. 2002).

The standard of review under AEDPA is somewhat different where the highest state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. <u>Greene v. Lambert</u>, 288 F.3d 1081, 1089 (9th Cir. 2002); <u>Bailey v. Newland</u>, 263 F.3d 1022, 1028 (9th Cir. 2001); <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000). When confronted with such a decision, a federal court

should conduct "an independent review of the record" to determine
whether the state court clearly erred in its application of
controlling federal law.  Id.  The federal court need not otherwise
defer to the state court decision under AEDPA: "A state court's
decision on the merits concerning a question of law is, and should
be, afforded respect.  If there is no such decision on the merits,
however, there is nothing to which to defer." Greene, 288 F.3d at
1089.  In sum, "while we are not required to defer to a state
court's decision when that court gives us nothing to defer to, we
must still focus primarily on Supreme Court cases in deciding
whether the state court's resolution of the case constituted an
unreasonable application of clearly established federal law."
Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001), abrogated on
other grounds, Mancuso v. Olivarez, 292 F.3d 939, 944 n.1 (9th Cir.
2002).  A summary decision by a state court does not "implicitly"
make any factual findings in support of the decision.  Id. at 913
(refusing to infer factual findings from state court summary denial
of habeas petition).

Here, the only reasoned state court decision is the appellate
court's decision on direct review.  Because the California Supreme
Court issued a summary denial of all of Petitioner's claims
presented in his two habeas petitions, this Court must undertake an
independent review of the record regarding the claims presented in
the petitions to determine whether the state supreme court clearly
erred in its application of controlling federal law.

DISCUSSION

I. Preliminary Hearing Testimony of Aurelio Lopez

Petitioner argues that he was denied the right to confront and

16

cross-examine Aurelio Lopez effectively at the preliminary hearing, the only time Lopez appeared as a witness, because the prosecution failed to disclose exculpatory and impeachment evidence to defense counsel in time for him to use it in his cross-examination of Lopez. Respondent argues that the state appellate court's denial of this claim was not contrary to or an unreasonable application of established Supreme Court precedent.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the States through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. Davis v. Alaska, 415 U.S. 308, 315-16 (1974).

Crawford does not apply retroactively to cases on collateral review. Whorton v. Bockting, 127 S. Ct. 1173, 1184 (2007).[7] For the cases governed by pre-Crawford law, the basic rule is:

> [A]n out-of-court statement against a criminal defendant [i]s admissible at trial if two conditions [are] met. First, 'in order to introduce relevant statements at trial, state prosecutors [must] either produce the declarants of those statements as witnesses at trial or demonstrate their unavailability.' [Citations.] Second, even if prosecutors succeed in demonstrating unavailability, the statements are

[7]The parties agree that Crawford does not apply to this case because is was decided after the events at issue occurred.

only admissible if they bear 'adequate indicia of
reliability.'  The 'indicia of reliability' requirement is met
if the statements fall within a 'firmly rooted hearsay
exception' or contain 'particularized guarantees of
trustworthiness.'

Bockting v. Bayer, 505 F.3d 973, 978 (9th Cir. 2007) (citations
omitted).

Before Crawford, prior preliminary hearing testimony was
admissible at trial where the declarant was unavailable.
California v. Green, 399 U.S. 149, 165-66 (1970) (where defendant
had opportunity to cross examine declarant at preliminary hearing,
no Confrontation Clause violation in admitting statements at trial
when declarant professed loss of memory).

The government must show that the witness is "unavailable."
Terrovona v. Kincheloe, 852 F.2d 424, 427 (9th Cir. 1988) (dead
witness); Barker v. Morris, 761 F.2d 1396 (9th Cir. 1985) (same).
This requires that the prosecutor make a good faith effort to
obtain the witness's presence.  Barber v. Page, 390 U.S. 719, 724-
25 (1968).

A Confrontation Clause claim is subject to harmless error
analysis.  United States v. McClain, 377 F.3d 219, 222 (2d Cir.
2004).  In the context of reviewing a state court conviction under
28 U.S.C. § 2254, this means that relief is in order only if the
evidence at issue "had substantial and injurious effect or
influence in determining the jury's verdict."  Brecht, 507 U.S. at
623.

The state appellate court summed up the facts relevant to this
claim as follows.

At the preliminary hearing, Lopez testified that Shalaman
and appellant had had a fistfight at the nightclub a
month earlier but that their disagreement was settled by

18

the time of the shooting. He also said that appellant
appeared to have a gun but that Lopez was not sure and
that Caballero also had "something on him" though Lopez
did not see Caballero display a weapon. Lopez heard
Caballero say something like, "Do you have a problem with
me" but did not see whether Caballero was getting ready
to fight. Lopez never testified that appellant shot
Caballero.

On the second day of the prosecution's case, the trial
court held a hearing on the question of whether Lopez was
an unavailable witness. The defense argued that the
prosecution did not act diligently in pursuing Lopez and
had therefore failed to show that he was unavailable.
The court ruled that the prosecution had exercised
reasonable diligence and, hence, that the witness was
unavailable.

The next day, Detective Alcantar testified that on May
15, Detective Ramirez found methamphetamine and a gun in
Lopez' bedroom in the apartment Lopez shared with
appellant, among others. This information was previously
unknown to both the prosecution and the defense. Defense
counsel moved for a mistrial, arguing that the late
disclosure was a discovery violation, that it prejudiced
the defense at trial, and that if the information had
been timely disclosed, it would have affected Lopez's
credibility at the preliminary hearing, and counsel's
cross-examination of Lopez at that hearing.

Detective Alcantar stated that Ramirez wrote a report
under a different case number about the discovery of the
gun and drugs but failed to mention it in his report on
this case because the information was unrelated to it.

Both the prosecution and defense knew from police reports
made available before the preliminary hearing that on May
15 the police arrested Lopez on an outstanding warrant
for gun and weapon possession charges, that he was
convicted of them, and was released on probation.

The court denied the motion for a mistrial, explaining
that "prejudice doesn't amount to that level where it
warrants that type of remedy."

People v. Valdovinos, HO19599, *10-11.

The state appellate court denied Petitioner's Confrontation

Clause claim, reasoning as follows:

In deciding this claim, the critical question is whether
a preliminary hearing cross-examination of Lopez that had
included such information would have affected the trial.
As we explain, we conclude that it would not have.

First, Lopez had a motive to shift blame to appellant
that was far more powerful than avoiding prosecution on
weapon and drug charges: he wanted to avoid being
prosecuted himself for the murder.  During closing
argument, defense counsel raised this matter when, after
reminding the jury that Lopez was present at the
shooting, and that drugs and a gun were found in his
room, counsel suggested that Lopez might be the killer.
Counsel said that the murder stemmed not merely from a
fistfight, but from "a drug deal gone bad."  Second, if
Lopez was falsely accusing appellant at the preliminary
hearing, he was doing so none too directly.  Lopez failed
to say definitively even that he saw appellant with a
gun, much less that he saw appellant shoot Caballero.
Defense counsel pointed these facts out in closing
argument.  Indeed, Lopez's evasive and conflicting
statements, both to the police and at the  preliminary
hearing, suggested that he was trying to cover for
appellant, rather than falsely accuse him.  In view of
the fact that Lopez was evidently trying to avoid
incriminating appellant, counsel would not have succeeded
by developing relatively mild additional evidence of
Lopez's motive for incriminating appellant.  Thirdly,
defense counsel made full use of the belatedly disclosed
information to argue that Lopez was telling the
authorities what they wanted to hear in order to avoid
prosecution for the later weapon and drug offenses.
Accordingly, defense counsel made every conceivable
argument to the jury based on the belatedly disclosed
information.  Thus, appellant fails to demonstrate how
the defense would have fared any better if Lopez had been
cross-examined at the preliminary hearing on this most
recent drug and weapon possession.  Similarly, appellant
fails to demonstrate how the state's belated disclosure
of the evidence deprived him of an opportunity for
effective cross-examination of Lopez at the preliminary
hearing.

Id. at *12-13.

Petitioner argues that the appellate court incorrectly applied
established Supreme Court precedent because it improperly relied
upon the defense counsel's argument to the jury as the source of
the information for the jury to use in evaluating Lopez's
testimony.

The appellate court properly addressed the prejudice analysis.
Although the appellate court pointed out that defense counsel's
arguments to the jury included all the impeachment material, it did

not have to rely on this fact to conclude that the jury verdict would not have been different even if defense counsel had been able to impeach Lopez at the preliminary hearing. This is because, as the appellate court discussed, Lopez's testimony at the preliminary hearing did not particularly incriminate Petitioner as the murderer.

The relevant testimony on direct examination at the preliminary hearing is as follows:

Q: Did you see the shooting when it started?

A: No, I didn't see that.

Q: Where were you?

A: I was outside also, but I wasn't looking at that.

. . .

Q: Now, the day of the shooting, did you see who the shooter was?

A: I didn't see exactly who it was.

Q: Did you see anybody with a handgun in their hand?

A: Well, I didn't see exactly what it was, you know.

Q: Okay. Did you see something that kind of looked like a handgun?

A: Yeah, but the other guy also had something on him, also with him. . . . Well, I don't know if it was a gun, or a beer, I don't know but I saw something.

Q: And who had the gun, or the beer?

A: We, I don't know. I really didn't see who it was.

. . .

Q: Did you see people running away from that body?

A: Well, only that. Yes.

Q: And that was within seconds of the shooting?

A: Yes.

1    Q: And did you see that one of these people running away was
     Felix [Petitioner]?

2

3    A: Yes, because I did, everybody ran.

     Q: You would agree, and tell me if you would not, that the
4    person that shot the victim had to be somebody within a small group
     that was next to him?

5

6    A: Well, but I don't know.  I don't know.  I wasn't looking
     over there.

7    Q: Did you ever see Felix with something that appeared to be a
     gun?

8

9    A: Yes, but I don't know if it was a gun.

10   . . .

11   Q: Did you ever tell this detective seated next to me that you
     saw Felix with a gun?

12   A: Well, okay.  Well, he asked me that, and he was treating me
     very badly also, and it wasn't a gun.  I don't know what
13   it was.  I just said --.  In reality, I didn't see that
     it was a gun.

14

15   Q: My question is, did you tell the detective that it was a
     gun?

16   A: Well, well -- Well, I just said that, because he asked me.

17   Q: So, you did say it?

18   A: Well, yeah.

19   Q: And it was the truth?

20   A: Well, I don't know.  I don't know.  I'm not sure.

21   Clerk's Transcript (CT), Preliminary Hearing Transcript (PHT) at
     93-99.

22

23   The relevant testimony on cross-examination is as follows:

     Q: And did they [the detectives] tell you they were going to
24   implicate you in the murder if you didn't talk?

25   A: Well, not so much like that, but they did treat me badly.

26   . . .

27   Q: Now, were you afraid you might be a suspect in the murder
     when you were answering questions?

28

                                22

**United States District Court**
For the Northern District of California

A: Yes.

Q: And you knew that they were investigating Felix Solorio Valdovinos; right?

A: Yes.

Q: And did you make things up to implicate Solorio Valdovinos to try to save yourself?

A: Well, no, only what they asked me.

Q: Well, when they asked you, did you see Felix Solorio Valdovinos with a gun, what did you answer when they asked you that?

A: Well, they asked me if I had seen Felix Valdovinos with a gun, and I don't remember -- I don't remember exactly. I don't remember what -- what I said.

Q: If I tell you that you gave a statement to Sergeant Ramirez and Sergeant Alcantar saying that you saw Felix with a gun, would that help you remember what you told the sergeants when they were interviewing you?

A: Well, yeah. I remember saying that, yeah.

Q: Why did you say that, if it wasn't true?

A: Well, they were asking me, did he have something on him, and did he carry something with him.

Q: And did you give them that answer, because you thought that was the answer that they wanted to hear?

A: Well, yeah.

Q: And it was also because you were in custody, and you were afraid of what might happen to you, if you didn't answer that way?

A: Yes.

. . .

Q: I note that you're here testifying in custody today, and you're wearing trustee type clothing, have you resolved your case that you were arrested on?

A: Yes.

Q: You plead guilty?

A: Yes.

23

CT, PHT at 100-04.

This testimony shows that it was not unreasonable for the state court to find that "Lopez's evasive and conflicting statements, both to the police and at the preliminary hearing, suggested that he was trying to cover for appellant, rather than falsely accuse him."

The state court's decision, that the lack of the additional impeachment evidence that the police had found a gun and drugs under Lopez's bed when they arrested him did not prejudice Petitioner, was not contrary to or an unreasonable application of clearly established federal law.

II. Showing that Lopez was Unavailable

Petitioner argues that the release of Lopez on probation, and the failure to keep track of him after his release shows that the prosecution did not exercise sufficient diligence in ensuring Lopez's presence at trial.

The California appellate court addressed this issue as follows:

> Appellant contends that the release of Lopez on probation defeats the prosecution's showing that it used reasonable diligence to locate Lopez. We disagree.
>
> The facts reveal that on August 25, when he testified at the preliminary hearing, Lopez was in custody on charges set forth in the arrest warrant. Lopez pleaded guilty and, between August 25 and October 26, he was released on probation. A few days before October 26, which was scheduled to be the first day of trial, Lopez called the prosecutor and agreed to be on phone standby as a witness. In a subsequent telephone call, Lopez told the prosecutor that he had a new address. The prosecutor kept in telephone contact with Lopez every three or four days. However, when the case was assigned to a judge for trial, the prosecutor was unable to contact or subpoena Lopez. His telephone was disconnected, and he had quit his job without saying where he had gone. Efforts to find him at his residence, jails, and hospitals failed.

24

His family did not know where he was.

When Lopez was arrested on the arrest warrant, he
possessed a gun and narcotics yet he was not charged with
those crimes, and then, after pleading guilty to the
arrest warrant charges, he was released on probation.
Given these circumstances, appellant claims the
prosecution did not do all it could have done to secure
Lopez's presence at trial.

This case is distinguishable from <u>People v. Louis</u>, 42
Cal. 3d 969 (1986). In <u>Louis</u>, the prosecution released a
crucial witness from jail and he disappeared before
trial. By contrast, in this case, Lopez was released
upon probation, after pleading guilty to weapon and drug
charges. The release upon probation gave the prosecution
good reason to believe that Lopez would not abscond.
Further, the record shows that the prosecutor kept in
touch with Lopez by telephone, and Lopez had agreed to
cooperate. Given these circumstances, there was no abuse
of discretion.

<u>People v. Valdovinos</u>, HO19599, *13-14.

Petitioner cites <u>Ohio v Roberts</u>, 448 U.S. 56, 65 (1980), for

the proposition that the prosecution did not adequately show that

it made diligent efforts to locate Lopez before he was declared

unavailable as a witness.

In <u>Roberts</u>, the Supreme Court stated:

[W]hen a hearsay declarant is not present for cross-
examination at trial, the Confrontation Clause normally
requires a showing that he is unavailable.

A witness is not 'unavailable' for purposes of the . . .
exception to the confrontation requirement unless the
prosecutorial authorities have made a <u>good faith effort</u>
to obtain his presence at trial.

<u>Id.</u> at 66, 74 (emphasis in original).

The state court found that the prosecution had good reason to

believe that Lopez would not abscond when he was released on

probation and that the prosecutor kept in touch with Lopez by

telephone after he was released. Furthermore, after Lopez

absconded, the prosecution attempted to locate him by contacting

25

**United States District Court**
For the Northern District of California

his place of employment, his family, hospitals and jails. Based
upon this record, the state court did not unreasonably apply
Supreme Court authority in finding that the prosecution had made a
good faith effort to obtain Lopez's presence at trial.

Therefore, habeas relief based on this claim is DENIED.

III. Admission of Lopez's Out-of-Court Statement to Police

Petitioner argues that his Sixth Amendment right to cross-
examine Lopez was violated by the admission of Lopez's statement to
the police that Petitioner had a gun on the night of the shooting.

The prosecutor elicited testimony from Detective Ramirez that
Lopez had told the detectives during his interrogation that he had
seen a small pistol in Petitioner's hand the night of the shooting.
RT at 547. On cross-examination, Detective Ramirez testified that,
when asked to describe what he saw in Petitioner's hand, Lopez
said, "Listen, one becomes scared, you see, I can't tell you. I
only saw that he had something but I can't tell, tell you, I don't
know." RT at 550. Detective Ramirez testified that this was
Lopez's first response, and it was only after further questioning
by detectives that he responded that what Petitioner had in his
hand appeared to be a pistol. RT at 550.

The appellate court ruled that this claim was waived because
Petitioner did not object to Detective Ramirez's testimony at
trial.

A federal court will not review questions of federal law
decided by a state court if the decision also rests on a state law
ground that is independent of the federal question and adequate to
support the judgment. Coleman v. Thompson, 501 U.S. 722, 729-30
(1991). In cases in which a state prisoner has defaulted his

federal claims in state court pursuant to an independent and
adequate state procedural rule, federal habeas review of the claims
is barred unless the prisoner can demonstrate cause for the default
and actual prejudice as a result of the alleged violation of
federal law, or demonstrate that failure to consider the claims
will result in a fundamental miscarriage of justice.  Id. at 750.
The Ninth Circuit has recognized and applied the California
contemporaneous objection rule in affirming denial of a federal
petition on grounds of procedural default where there was a
complete failure to object at trial.  Inthavong v. Lamarque, 420
F.3d 1055, 1058 (9th Cir. 2005); Paulino v. Castro, 371 F.3d 1083,
1092-93 (9th Cir. 2004); Vansickel v. White, 166 F.3d 953, 957-58
(9th Cir. 1999).

A petitioner may show cause for a procedural default by
establishing constitutionally ineffective assistance of counsel,
but attorney error short of constitutionally ineffective assistance
of counsel does not constitute cause.  Id. at 494.  To establish
good cause on the ground of ineffective assistance of counsel, a
petitioner must show that (1) counsel made errors so serious that
counsel was not functioning as the counsel guaranteed the defendant
by the Sixth Amendment, and (2) the deficient performance
prejudiced the defense.  Loveland v. Hatcher, 231 F.3d 640, 644
(9th Cir. 2000)(quoting Strickland v. Washington, 466 U.S. 668, 687
(1984)).

Accordingly, this issue will be addressed below with
Petitioner's other ineffective assistance of counsel claims.

IV. Identification Procedures

Petitioner argues that the photo line-up identification

27

procedures used by the police were irreparably suggestive.  This claim was presented only to the California Supreme Court which issued a postcard denial.  Therefore, this Court independently reviews the record to determine if the state court's denial was contrary to or an unreasonable application of Supreme Court authority.

Procedures by which a defendant is identified as the perpetrator must be examined to assess whether they are unduly suggestive.  "It is the likelihood of misidentification which violates a defendant's right to due process." Neil v. Biggers, 409 U.S. 188, 198 (1972).  Unnecessarily suggestive pretrial identification procedures alone do not require exclusion of in-court identification testimony, however; reliability is the linchpin in determining the admissibility of identification testimony.  Manson v. Brathwaite, 432 U.S. 98, 100-14 (1977).  Identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure.  Van Pilon v. Reed, 799 F.2d 1332, 1338 (9th Cir. 1986).

An identification procedure is impermissibly suggestive when it emphasizes a single individual, thereby increasing the likelihood of misidentification.  Foster v. California, 394 U.S. 440, 443 (1969); United States v. Bagley, 772 F.2d 482, 493 (9th Cir. 1985).

In determining whether in-court identification testimony is

28

sufficiently reliable to outweigh a suggestive pretrial procedure, courts consider five factors: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification.  Manson, 432 U.S. at 114; Neil, 409 U.S. at 199-200; see, e.g., United States v. Jones, 84 F.3d 1206, 1209-10 (9th Cir. 1996) (although drive-by identification by witnesses was suggestive, it was permissible because there was not a substantial likelihood of misidentification); United States v. Wang, 49 F.3d 502, 505 (9th Cir. 1995) (identification of defendant in photographs reliable where witness had ample opportunity to view defendant and actually spoke with him).

Petitioner argues that the two photo line-ups shown to Diaz and Castro were impermissibly suggestive because Petitioner's photo was the only one in both line-ups.  He also argues his identification by Castro, Diaz and Miranda at the preliminary hearing was impermissibly suggestive because he was clothed in jail garb and had his legs and hands shackled so that "the tentative nature of [the witness'] identifications was destroyed by the prosecution when it exposed Castro and Diaz to Valdovinos at the preliminary hearing."  Before the trial, Diaz coincidentally saw Petitioner in the hall in prisoner garb and recognized him there. Petitioner argues this pre-trial viewing of him by Diaz was also impermissibly suggestive.

The photo line-ups were not unduly suggestive.  The

photographs of Petitioner in the two line-ups were described as
being very different from each other and from how Petitioner looked
at trial.  In the first lineup, the photograph of Petitioner was
from the California Department of Motor Vehicles (DMV) and
Petitioner had curly hair.  RT at 411, 442.  All the photographs in
the first lineup were also DMV photos of Hispanic males, with a
mustache and short to medium hair.  RT at 444.  In the second
lineup, the photograph of Petitioner was different than in the
first lineup because his hair was shorter.  RT at 333, 445.  In
fact, Diaz was not sure that the photos he picked in the two
lineups were of the same man.  RT at 334.  At the trial, Petitioner
did not have a mustache like he did in the two photographs.  RT at
332.  Petitioner's argument that the lineups were overly suggestive
because his photo was the only one that appeared in both, is belied
by the fact that his appearance in the two photos was different.

However, even if impermissibly and unnecessarily suggestive
pretrial identification procedures were used, the in-court
identification need not necessarily be excluded as tainted.  In
order to analyze the in-court identifications under the factors set
out in Manson and Neil, the specific circumstances of each witness'
opportunity to view the shooter on the night of the murder must be
considered.

A. Diaz

Diaz, a twenty-five year old Mexican male, testified that, on
the night of the shooting, he went to the El Rancho nightclub by
himself.  RT 254-55.  He was acquainted with Caballero, the victim.
RT 256.  Just before the shooting, Diaz went by himself outside the
club into the parking lot.  RT 258.  Caballero saw Diaz and came

30

over to greet him.  RT 258.  Then another man named Shalaman came over.  RT 259.  Shalaman said there were three men who would shoot him if they saw him.  RT 261.  Diaz saw the three men Shalaman was talking about, but he didn't know who they were.  RT 261.  The three men came over to where Diaz was standing with Caballero and Shalaman.  RT 262.  Diaz had no trouble seeing the three men when they walked over to them.  RT at 266.  The door for exit and entry into the nightclub was lit up.[8]  RT 266.  One of the men had on a black cowboy hat and was wearing a black leather jacket.  RT 263-64.  Caballero asked the men whether any of them had a problem with his friend.  RT 268.  The man in the black hat and leather jacket said he did have a problem with him.  RT 268.  Then Caballero said, "let's fight," and he started to unbutton his jacket when Diaz heard a shot.  RT 269-70.  The man in the black jacket started to take his jacket off.  RT 271.  Diaz was glancing back and forth between Caballero and the man in the black jacket.  RT 271.  Then Diaz heard another shot.  RT 271.  He turned and saw that the man with the black jacket and black hat was shooting.  RT 271.  Diaz didn't look at the gun and couldn't describe it.  RT 272.  Diaz thought the man was going to shoot him and Shalaman also.  RT 272.  After the first shot, two of the men with the shooter took off running.  RT 273.  The man with the black hat stayed, went over to Caballero who was on the ground, shot him again, and then he went running.  RT 273.  The two groups of men were within a pace or two of one another.  RT 275.  Diaz looked directly into the face of the shooter.  RT 277.  Diaz identified Petitioner in the courtroom as

---

[8]On cross-examination, Diaz agreed with defense counsel that it was dark. RT 327.

1   the shooter.  RT 278.  When he was asked if he was sure Petitioner

2   was the shooter, Diaz responded, "Yes, yes.  The only thing is,

3   that he had a mustache the day that that happened."  RT 278.

4        Applying the Manson and Neil factors, it is apparent that

5   Diaz's in-court identification of Petitioner was sufficiently

6   reliable to be admitted, even if prior identification procedures

7   had been suggestive.  First, Diaz had an excellent opportunity to

8   view the shooter at the time of the incident.  Second, Diaz's

9   degree of attention was high because after the shooter shot

10  Caballero, Diaz thought he was to be shot also.  Third, Diaz's

11  description to the detectives was accurate in that the shooter was

12  a Mexican male who was about Diaz's height[9] and who was wearing a

13  black cowboy hat, a black leather jacket and had a mustache.

14  Fourth, Diaz was very certain of his identification of Petitioner

15  in court as the shooter.  Fifth, the length of time between the

16  incident and the first photo line-up was only a few days.  There

17  were a few months between the time Diaz viewed the first and second

18  line-ups and another few months until the identification at the

19  trial.  However, given that the first four factors demonstrate a

20  strong indicia of reliability, the fifth factor does not detract

21  from the reliability of Diaz's in-court identification.  The fact

22  that Diaz identified Petitioner at the preliminary hearing and in

23  the hall before the trial does not detract from Diaz's reliability

24  as a witness.

25       Therefore, the state court did not unreasonably apply federal

26  law in rejecting Petitioner's claim regarding Diaz's

27  _____

28       [9]Both Diaz and Petitioner are about five foot, six inches
    tall.

                                32

identification.

2    B. Castro

3    On the night of the murder, twenty-six year old Tracy Castro
4 was driving around with her friend, Say Miranda. RT at 336. They
5 stopped at El Rancho bar so that Castro could use the bathroom. RT
6 at 337. On her way into the bar, Castro ran into Caballero, an
7 acquaintance. RT at 339. Castro and Miranda went into the bar.
8 RT at 341. When they came out the back door into the parking lot,
9 Castro immediately spotted Caballero. RT at 342. He was with a
10 group of men, and was engaged in conversation with one of them. RT
11 at 342. Castro did not know any of the men with Caballero. RT at
12 342. The man who was talking to Caballero was wearing a cowboy
13 hat, jeans and a black leather waist jacket. RT at 343. The man
14 in the cowboy hat pulled a gun out of his waistband and started
15 firing. RT at 343. Castro was close enough to see the spark from
16 the gun. RT at 343. The distance was about twenty to twenty-five
17 feet. RT at 343-44. Castro is an emergency medical technician;
18 even though she was scared, she walked toward Caballero and the man
19 in the cowboy outfit to see if she could help Caballero. RT at
20 344. After Caballero fell, the shooter looked at Castro and
21 Miranda, made eye contact with them, then turned around and shot
22 Caballero in the temple. RT at 345. After this shot, the man in
23 the cowboy outfit stepped over Caballero and walked away, went to
24 his car and drove slowly out of the parking lot. RT at 345-46.
25 Castro acknowledged that she picked photos of men other than
26 Petitioner from two photo lineups she was shown. RT at 353. She
27 said, "Looking at pictures of somebody and seeing somebody's cold-
28 blooded face, you know the difference." RT at 354. Then she

United States District Court
For the Northern District of California

identified Petitioner sitting in the courtroom as the shooter.  RT
at 355.

On cross-examination, Castro stated that she had twenty-twenty
vision and that she got a pretty good look at the man who shot
Caballero.  RT at 366.  She admitted that she described to the
police a man who was six feet tall.  RT at 369.  She explained that
anyone wearing a cowboy hat and cowboy boots looks quite tall.  RT
at 368-69.  Castro admitted that at first she described the shooter
as not having a mustache, but later described him as having a
mustache.  RT at 371.  On re-cross, Castro admitted she had
described the shooter as weighing 180 to 190 pounds.[10]  Castro also
said the shooter was wearing a white cowboy hat.  RT at 373.  She
maintained that she was still sure that the shooter was Petitioner
who she had identified in court.  RT at 380.

Applying the Manson and Neil factors, Castro's in-court
identification of Petitioner was sufficiently reliable to be
admitted, even if prior identification procedures had been
suggestive.  First, like Diaz, Castro had an excellent opportunity
to view the shooter.  She knew Caballero and saw him talking to the
shooter.  After the first shot she walked toward the two men, and
the shooter looked directly into her eyes.  Therefore, like Diaz,
she saw the shooter close up.  Second, her degree of attention was
high.  Third, even though she incorrectly told the police the
shooter was six feet tall and weighed 180 pounds, other details of
her description of the shooter were accurate.  Fourth, even though
Castro did not select Petitioner in the two photo lineups, she was

_____

[10]At the time of the trial, Petitioner was estimated to weigh
about 150 pounds.

very certain of her identification of him in court.

Furthermore, Castro twice failed to identify Petitioner in photo line-ups as the shooter. Thus, it seems unlikely that they would have "tainted" her in-court identification of Petitioner.

Therefore, the state court's decision was not contrary to or an unreasonable application of federal law.

V. Brady Claims

Petitioner argues that the prosecution's failure to disclose the following exculpatory evidence is a constitutional violation under Brady v. Maryland: (1) the gun and methamphetamine discovered in Lopez's possession; (2) the favorable treatment received by Lopez in return for his testimony; and (3) Castro's misidentifications and Diaz's tentative identification in the photo lineups. With his traverse, Petitioner filed four pieces of newly discovered evidence that is part of his Brady claim. The first is an anonymous letter purportedly sent to Caballero's family, found in the prosecutor's case file, and never disclosed to the defense. The writer of the letter claims that Caballero's murder was a contract killing ordered by Ramon Balemos over a debt. Chayra Dec., Ex. A. The second is a written statement from Juan Ledezma stating that Lopez had told Ledezma that (a) Lopez had two guns, a .380 and a 9mm; (b) Lopez had killed someone at a bar in San Jose and placed the blame on Petitioner; and (c) Lopez told his brother to throw out the gun that he used in that killing. Boyle Dec., Ex. A. The third piece of newly discovered evidence consists of police documents concerning the drugs and gun found in Lopez's possession. Boyle Dec., Exs. C-F. The fourth is a photograph found in the police file of Jose Mongia, a Hispanic male who is dressed in a

black hat and black leather jacket, the same clothing believed to have been worn by the shooter.

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87. The Supreme Court later made clear that the duty to disclose such evidence applies even when there has been no request by the accused, <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 682.

"There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). Prejudice will be found if the suppressed evidence was "material" under state law to the accused's guilt or punishment. <u>Anderson v. Calderon</u>, 232 F.3d 1053, 1062, 1066 (9th Cir. 2000).

Neither the prosecutor's good faith nor actual unawareness of exculpatory evidence in the government's hands is determinative of

the prosecution's disclosure obligations. <u>Carriger v. Stewart</u>, 132 F.3d 463, 479 (9th Cir. 1997) (en banc); <u>United States v. Kearns</u>, 5 F.3d 1251, 1254 (9th Cir. 1993).

A defendant need only demonstrate a reasonable probability that the result of the proceeding would have been different. <u>United States v. Kojayan</u>, 8 F.3d 1315, 1322 (9th Cir. 1993). The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial. <u>Kyles</u>, 514 U.S. at 434; <u>United States v. Golb</u>, 69 F.3d 1417, 1430 (9th Cir. 1995).

A "reasonable probability" may not be based on mere speculation without adequate support. <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6-8 (1995); <u>see, e.g.</u>, <u>Downs v. Hoyt</u>, 232 F.3d 1031, 1037 (9th Cir. 2000) (rejecting as speculative argument that withheld material might have led to some admissible evidence which might have been sufficiently favorable to meet the <u>Bagley</u> standard).

As noted, impeachment, as well as exculpatory, evidence falls within the <u>Brady</u> rule. <u>Bagley</u>, 473 U.S. at 676; <u>Giglio v. United States</u>, 405 U.S. 150, 154-55 (1972). "<u>Brady</u> information [therefore] includes 'material . . . that bears on the credibility of a significant witness in the case.'" <u>United States v. Brumel-Alvarez</u>, 991 F.2d 1452, 1461 (9th Cir. 1992) (quoting <u>United States v. Strifler</u>, 851 F.2d 1197, 1201 (9th Cir. 1988), <u>cert. denied</u>, 489 U.S. 1032 (1989)); <u>see, e.g.</u>, <u>Killian v. Poole</u>, 282 F.3d 1204, 1210 (9th Cir. 2002) (conviction reversed where undisclosed letters would have been valuable to the defense in impeaching "make-or-break" witness' credibility before the jury); <u>Singh v. Prunty</u>, 142 F.3d 1157, 1161-63 (9th Cir. 1998) (petitioner entitled to habeas

relief where prosecution suppressed evidence of agreement to
provide benefits to key witness in exchange for his testimony, and
reasonable probability existed that had evidence been disclosed one
or more members of jury would have viewed the testimony
differently).

The materiality of suppressed evidence is considered
collectively, not item by item. See Kyles, 514 U.S. at 436;
Carriger v. Stewart, 132 F.3d 463, 480 (9th Cir. 1997) (en banc).

Delay in disclosure does not deprive an accused of due process
where disclosure is made during trial if the disclosure, though
tardy, is still of value to the accused. United States v. Vgeri,
51 F.3d 876, 880 (9th Cir. 1995); United States v. Browne, 829 F.2d
760, 765 (9th Cir. 1987). Due process requires only the disclosure
of exculpatory material in sufficient time to permit defendant to
make effective use of the material. LaMere v. Risley, 827 F.2d
622, 625 (9th Cir. 1987).

A. The Photo Line-ups

This is the only Brady claim that was included in the reasoned
decision of the state appellate court.

The facts, as set forth by the appellate court, are

> While cross-examining Diaz, defense counsel discovered
> that the police had shown photo lineups to both Diaz and
> Castro. Relying upon the untimely disclosure, defense
> counsel moved immediately for a dismissal of the charges
> against appellant. Although the trial court denied the
> motion, it noted that the ruling might have been
> different had the untimely disclosure occurred after the
> trial. Defense counsel then moved for a mistrial and
> argued that he would have handled the preliminary hearing
> differently had the information been disclosed when it
> should have been. Counsel did not specify what he would
> have done differently. Without formally denying the
> motion, the trial court said it would read an instruction
> to the jury that explained the situation. The court
> noted that it had found no willful violation and that

United States District Court
For the Northern District of California

1    defense counsel could pursue the matter in his argument,
     could call additional witnesses, and could have
2    additional time to prepare.  The court then read the jury
     instruction.  (CALJIC No. 2.28)
3
People v. Valdovinos, HO19599, *16.
4
5        Defense counsel did a thorough cross-examination of both Diaz

6    and Castro about the photo lineups and their identifications and

7    emphasized in his closing argument that the non-disclosure of two

8    eyewitness lineups was either negligence or deliberate concealment

9    on the part of the police and prosecutor.  RT 661.  He also argued

10   that the non-disclosure of the exculpatory evidence prevented the

11   defense from investigating further and developing any defense

12   theories based on it.  RT 662.

13       The appellate court analyzed this claim as follows:

14       Appellant relies upon Brady v. Maryland, 373 U.S. 83, 88
         (1963) but it does not apply here since in this case the
15       prosecution did disclose the evidence, it just did so in
         an untimely manner.  Accordingly, the question is not
16       whether the evidence was material but whether the
         untimely disclosure was material.  Thus we must decide
17       how learning of the evidence later rather than sooner
         prejudiced the defense.  (See e.g. United States v.
18       Bagley, 473 U.S. 667, 682 (1985)).

19       With respect to this issue, appellant merely states that
         "if counsel for defendant had been provided the
20       information . . . in time to employ that information in
         cross-examination of the various witnesses, it cannot be
21       said with certainty that the jury would then have
         [convicted]."
22
         Review of the record discloses that there was no
23       prejudice.  Defense counsel was able to cross-examine
         both Diaz and Castro about their identifications.
24       Counsel also stressed the belatedness of the disclosure
         during his cross-examination of Alcantar.  During closing
25       argument, defense counsel emphasized the issue when he
         stated: "Let me comment a little bit on the lineups.
26       Okay.  I'm appalled: I'm absolutely appalled.  In the 10
         years I've been a P.D., I've never gone through and in
27       the middle have this issue of lineups come up all of a
         sudden.  Here's an eyewitness, Tracy Castro, who's shown
28       a lineup before we go to preliminary examination, and
         twice she couldn't ID my client whose picture is in the

                                   39

1        lineup. At . . . best, it's sloppy police work. At
       worst, it's deliberate concealment. It's not fair. It's
2        not fair due process. It doesn't allow us to investigate
       the case. Let me point another thing out. The police,
3        when they showed that lineup to Joaquin Diaz, they know
       who they're looking for. They know who their suspect is.
4        They've got this lineup okay. They've got a lineup and
       they're presenting it to Joaquin Diaz, the convicted
5        felon who's on probation, who wants to do whatever he can
       to help the police to stay out of trouble. He wants them
6        out of his face, out of his hair. I wasn't there. I
       submit to you that it's just human nature to try to help
7        you get the job done, that perhaps it's conveyed or
       communicated somehow as to who the police are looking
8        for, who the suspect is when they're showing that lineup.
       In any event, . . . it's again, at best . . . just sloppy
9        police work. At worst, it's deliberate concealment of
       evidence. And they know perhaps, if we had that
10       evidence, which is exculpatory evidence, we would then
       follow up, and we would develop our defense based on that
11       exculpatory evidence."

12       Defense counsel never asked for a continuance to allow
       him to "follow up" nor has he suggested what such follow
13       up would have been. Appellant does not suggest how the
       witnesses could have been more effectively cross-examined
14       had he been able to explore their lineup identifications
       with them at the preliminary hearing. Having failed to
15       show prejudice, appellant's argument must be rejected.

16 People v. Valdovinos, HO19599, *16-17.

17      Petitioner argues that the appellate court used a legal

18 standard that was contrary to federal law because it said Brady was

19 inapplicable to Petitioner's claim because he had received the

20 information during the trial. Petitioner is correct that a late

21 disclosure of exculpatory evidence at trial is a Brady violation if

22 the defense cannot effectively use it at trial. Nonetheless,

23 although the appellate court stated that the late disclosure took

24 the claim out of the realm of Brady, it used the correct standard

25 in analyzing the claim. See LaMere, 827 F.2d at 625 (due process

26 requires only disclosure of exculpatory material in sufficient time

27 to permit defendant to make effective use of the material).

28 Therefore, the appellate court's decision was not contrary to or an

1   unreasonable application of Supreme Court authority.

2       Petitioner argues that the appellate court's factual analysis

3   was unreasonable because, "although evidence of the photo lineups

4   was discovered during defense cross-examination of Diaz before

5   trial was over and the defense was able to cross-examine Castro and

6   Diaz about their identifications of Valdovinos, the defense was not

7   able to use that evidence to test their recollections of the

8   shooter before the witnesses had been exposed to Valdovinos at the

9   preliminary hearing. . . . the witnesses' identifications of

10  Valdovinos at trial were undoubtedly affected by their repeated

11  exposure to Valdovinos' photographs at the photo lineups and to his

12  physical presence at the preliminary hearing and trial.  Defense

13  counsel was unable to prepare to pursue this issue, since he was

14  unaware until cross-examining Joaquin Diaz that any witnesses had

15  ever viewed photo lineups, an opinion the prosecution did nothing

16  to correct at the preliminary hearing."  Traverse at 46-47.

17  Petitioner also argues that if defense counsel had known the

18  witnesses had been exposed to Petitioner's photographs, counsel's

19  strategy would have significantly changed in that he could have

20  consulted a memory expert to explore the potentially corrupting

21  effect of the witnesses' exposure to the photo lineups or he could

22  have more effectively argued for a blackboard preliminary hearing.

23      Petitioner does not state how he could have more effectively

24  cross-examined either Diaz or Castro than he did at the trial.  His

25  cross-examination succeeded in showing that Diaz took approximately

26  twenty minutes to decide which photo to select at each of the two

27  photo lineups and even then his identification was conditional.

28  Castro admitted that she had picked out the wrong person in both

41

1  photo lineups she had been shown by the police.  In his closing,

2  defense counsel emphasized the problems with Castro's and Diaz's

3  eyewitness testimony.

4      Petitioner does not say how a memory expert would be able to

5  further impeach Castro and Diaz's testimony.  Petitioner also does

6  not explain how knowing of the photo lineups would have helped him

7  obtain a blackboard preliminary hearing; his argument for the

8  blackboard hearing was based upon his assumption that neither

9  Castro nor Diaz had seen a photo lineup.

10     Further, Petitioner's argument that the witnesses'

11 identifications of him at the preliminary hearing were tainted by

12 the undisclosed photo lineups is belied by the evidence.  Castro

13 had not been able to identify Petitioner in the photo lineups;

14 therefore, her memory could not have been tainted by viewing them.

15 Diaz only tentatively identified Petitioner in the photo lineups.

16 He did not even know if the two photos he chose were of the same

17 person.

18     Therefore, neither the appellate court's finding of facts nor

19 its conclusion that no prejudice was caused by the late disclosure

20 of the photo lineups was unreasonable.

21     B. Lopez Impeachment Information

22     During Petitioner's trial, after Lopez's preliminary hearing

23 testimony had been read to the jury, Detective Alcantar testified

24 that, on May 15, 1998, Detective Ramirez found methamphetamine and

25 a gun in Lopez's bedroom in the apartment Lopez shared with

26 Petitioner.  This information was previously unknown to the

27 defense.  Detective Alcantar stated that Detective Ramirez wrote a

28 report under a different case number about the discovery of the gun

42

and drugs and failed to mention it in his report on Petitioner's case because the information was unrelated to it.  The defense knew that, on May 15, the police arrested Lopez on an outstanding warrant for gun and weapon possession charges, and that he was convicted and released on probation.

Petitioner argues that the nondisclosure of the fact that Lopez possessed a gun and methamphetamine several days after the shooting delivered a critical blow to the defense because it could not confront and cross-examine Lopez about it at the preliminary hearing.  He also argues that the fact that Lopez was not charged with these crimes is exculpatory information because counsel could have shown that Lopez was biased in his testimony at the preliminary hearing in that he implicated Petitioner in exchange for not being charged with two crimes.

As discussed above, although Lopez testified at the preliminary hearing for the prosecution, his testimony did not particularly incriminate Petitioner as the shooter.  Therefore, any lost opportunity to impeach or cross-examine Lopez does not raise a reasonable doubt that the verdict would have been different. Furthermore, defense counsel knew that Lopez was arrested on older gun and drug charges; therefore, any impeachment of Lopez based on guns or drugs could have been undertaken given the evidence known to the defense.  Also, the defense knew that Lopez was going to be released on probation on the pending gun and drugs charge.  Any inference that Lopez was testifying for the prosecution in order to get a good deal could have been drawn from that fact.

Therefore, the state court did not unreasonably apply federal law in rejecting this claim.

43

C. Undisclosed Letter

Associate habeas counsel Kathleen Boyle describes a letter found in the police file addressed to Eulalio Caballero, the victim's relative: "The letter appeared to be typed on a typewriter which did not print out the typed letters as the typewriter carriage moved toward the right of the page. However, the imprints of these letters were visible on the original and I copied them onto the copy that I made at the Police Department; all of the handwriting on Exhibit A to the Declaration of Thompson Sharkey is mine." Boyle Dec. at 2. Petitioner also submits the declaration of Sonny Chayra, a Spanish-speaker who was hired by habeas counsel as an investigator, translating the letter to the victim's relative:

I have come to my decision

To say this

I did not do this (meaning, I was not the shooter who killed Nelson) and I do not know who the shooter is?

I worked w/ Ramon Balemas (could also be last name of Ramon [referencing that he socialized w/Ramon, as well as a business associate w/Ramon])

So send this letter to all your cousins (La Familia?)

This man (referring to Ramon) is very bad, and this man is the person who paid to have "Nelson" killed (take the life of your cousin)

That Ramon gave someone (?) a pistol, an ounce of powder (polbo could also refer to the cartridge-bullets, or to powder, "coke" or "meth", however, meth is not usually referred to as "powder") and also $800.00 to kill Nelson.

One of your cousins told me that Nelson (cousin) owed $ for "purchases" and Nelson had yet to pay Ramon to fulfill a debt Nelson owed.

However, Ramon had to wait until Nelson was working to pay a debt of approx. $3K. In December 16 (?) 1996, Ramon paid $1K, from the sale of "merchandise" (possibly

drugs) more merchandize (sic) to be sold later.

Well, my friend, until later, don't talk with anyone (no make comments to anyone)

Remember, Ramon tells "untruths" or "lies" ("marrundias" is "a very old term for telling bad things, stories, 'bullshit' etc") also meaning that Ramon cannot be trusted.

Chayra Dec. at 2-3.

Chayra explains the meaning of the letter as follows:

The general gist of this letter is to advise Eulalio Caballero that Nelson owed Ramon a lot of money, that Ramon gave someone a gun, money and paid someone to do the "hit" on Nelson. This is a letter from a possible member of the Nuestra Familia and or Mexican Mafia ("La Familia") warning that Ramon is very dangerous and to put the word out to La Familia that I (the writer) had nothing to do with the hit on Nelson. . . . The writer wants to clear the air that he was not the shooter and that Ramon was the man who put a contract out on Nelson.

Chayra Dec. at 3.

The copy of the letter in Spanish does not include parentheses or brackets; thus, it can be assumed that the words in parentheses and brackets are Chayra's remarks. Petitioner's trial attorney states in a declaration that he never saw the letter before Chayra showed it to him on May 13, 2004.

Respondent points out that the trial attorney does not state that the information in the letter was not known to him. Nor does he indicate what investigation he made prior to trial and how that investigation would have been different had he been given the letter.

The letter was <u>Brady</u> material in that it raised questions about the prosecution's theory of the motivation for Caballero's killing. It should have been disclosed to the defense. However, like the other <u>Brady</u> claims, this one also fails because its

disclosure would not have raised a reasonable doubt that would not have otherwise existed.

The meaning of the letter is questionable because many words have been filled in by Chayra. Because the letter is ambiguous and anonymous, it would not have been admissible at trial. There is no reason to believe the letter would have led to any admissible exculpatory evidence. There was sufficient other evidence introduced at trial for the defense to argue that the killing may have been related to a drug deal. In his closing argument, defense counsel made use of the drug evidence by arguing to the jury:

> What could the motive be? Well, you know Mr. Caballero
> is a drug dealer. You'll have proof of that, and you can
> take a look at it when you go back in the jury room. You
> know he's a drug user. He's been using coke, and he's
> been using meth. You know Aurelio Lopez is there
> present. You know that Aurelio Lopez -- when the cops go
> to search him or question him, he's got a warrant out for
> drugs and guns, and also they find an ounce of
> methamphetamine which is a sales type of amount and a 9
> millimeter handgun. You know that much.

RT at 663-64.

The letter does not cast a reasonable doubt on the jury's verdict.

D. Photograph of Mongia

Petitioner argues that the photograph of Jose Mongia wearing a moustache and cowboy hat would have undermined the state appellate court's prejudice analysis because the court relied upon the fact that only Petitioner was identified as wearing a cowboy hat. Although Boyle states that Mongia was a witness to the shooting, there is no admissible evidence that he was. It cannot be concluded that the photograph would have affected Petitioner's trial.

46

**United States District Court**
For the Northern District of California

Therefore, the state court's decision was not contrary to or an unreasonable application of federal law.

E. Ledesma Statement

John Ledesma is an individual found and interviewed by Boyle on January 23, 2004. Boyle had Ledesma write a letter in Spanish for which a translation is not provided. Boyle declares that Ledesma told her that Aurelio Lopez had told him that Lopez had two guns, that he had killed someone at a bar in San Jose and had placed the blame on Petitioner, and that he had told his brother to throw the gun away. However, this is not a <u>Brady</u> claim because Petitioner does not indicate that the prosecutor or police knew of Ledesma or this statement.

F. <u>Brady</u> Material Considered Collectively

Even together, the exculpatory evidence fails to raise a doubt about the outcome of the trial. The eyewitnesses' testimony was strong. The shooter's getaway car was similar to Petitioner's car. And, immediately after the shooting, Petitioner left California for Oregon where he was arrested.

VI. Ineffective Assistance of Counsel

In his original petition, Petitioner presented numerous ineffective assistance of counsel claims. However, in his reply, Petitioner states that counsel was ineffective for: (1) failing to object to Ramirez's testimony about Lopez's out-of-court statement, which put a gun in Petitioner's hand; and (2) failing to ask for a continuance after learning that the prosecutor had not disclosed evidence of the photo lineups, that a gun and drugs were found in Lopez's bedroom when he was arrested and that Lopez may have received leniency in exchange for his preliminary hearing

testimony.

A. Legal Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim a petitioner must establish two things. First, he must establish that counsel's performance was deficient, that is, that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. The court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. at 689.

Second, he must establish that he was prejudiced by counsel's deficient performance, that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the Strickland test if the petitioner cannot establish incompetence under the first prong. Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, a court need not determine whether counsel's performance was deficient

before examining the prejudice suffered by the defendant as the result of the alleged deficiencies.  Strickland, 466 U.S. at 697.

The Strickland framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  Williams v. Taylor, 529 U.S. 362, 404-08 (2000).

A. Lopez's Out-of-Court Statement

The state court found as follows:

> Appellant cannot satisfy this test [Strickland standard].
> Review of the record discloses that at the preliminary
> hearing defense counsel elicited from Lopez the part of
> his statement to the police that was most significantly
> inconsistent with his preliminary hearing testimony: that
> appellant did have a gun.  In his preliminary hearing
> testimony Lopez said only that appellant had what
> appeared to be a gun and that Lopez was not sure what it
> was.  Further, during closing argument, the prosecution
> never refuted appellant's contention that Lopez had good
> reason to tell the police what they wanted to hear.  It
> follows that the jury based its conviction not upon
> Lopez's testimony or statements but on all the other
> evidences that pointed toward appellant.  To summarize
> that evidence, only appellant was consistently identified
> as wearing a cowboy hat, only appellant was identified
> several times and by several witnesses as the killer,
> only appellant had the killer's car, and only appellant
> fled the state immediately after the murder, absconding
> so hurriedly that he left behind a paycheck.
> Accordingly, even if we assume that counsel had no
> rational tactical basis for failing to object, there was
> no prejudice.

People v. Valdovinos, HO19599, *14-15.

The appellate court's finding that there was no prejudice from counsel's failure to object to Lopez's out-of-court statement was not contrary to or an unreasonable application of federal law. Lopez's testimony was internally contradictory and did not strongly incriminate Petitioner.  Therefore, habeas relief cannot be granted on this claim.

B. Failure to Ask for a Continuance

Petitioner argues that, once trial counsel learned that the prosecution had not disclosed certain exculpatory evidence, he should have asked for a continuance to search the prosecution file to see if it contained other nondisclosed exculpatory evidence.

When defense counsel learned during his cross-examination of Diaz that, unbeknownst to him, Diaz and Castro had been shown two photo lineups, he moved to dismiss the case against Petitioner on the ground of a <u>Brady</u> violation. RT at 303; 316. When the court denied the motion to dismiss, defense counsel moved for a mistrial. RT at 318-19. However, the court ruled that the concealment could be remedied by reading CALJIC 2.28 to the jury. Therefore, defense counsel's representation of Petitioner at the time he learned of the withheld evidence, did not fall below the professional standard of conduct. Furthermore, there is no showing that a continuance would have resulted in anything that would have changed the result of the trial.

The state court's rejection of the claim that defense counsel was ineffective for failing to request a continuance was not contrary to or an unreasonable application of federal law.

VII. <u>Youngblood</u> Claim

Petitioner contends that the format of the photo lineups shown to Diaz and Castro and the prosecutor's failure to disclose the fact of the photo lineups caused the witnesses' memories to become corrupted. Petitioner argues that this amounts to a bad faith loss of material exculpatory evidence in violation of <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988).

The government has a duty to preserve material evidence, i.e.,

1  evidence with exculpatory value that was apparent before it was

2  destroyed and that is of such a nature that the defendant cannot

3  obtain comparable evidence by other reasonably available means.

4  <u>California v. Trombetta</u>, 467 U.S. 479, 489 (1984); <u>see also</u>

5  <u>Illinois v. Fisher</u>, 540 U.S. 544, 547-48 (2004); <u>Youngblood</u>, 488

6  U.S. at 58.

7       These arguments are variants on Petitioner's suggestive

8  identification and exculpatory information arguments addressed

9  above, and are more appropriately analyzed as such.

10      Therefore, the state court's rejection of Petitioner's

11 <u>Youngblood</u> claim was not contrary to or an unreasonable application

12 of federal law.

13                          CONCLUSION

14      For the foregoing reasons, the petition for writ of habeas

15 corpus is DENIED.

16

17 IT IS SO ORDERED.

18           3/12/08

19 Dated:_____    _____
                                       CLAUDIA WILKEN
20                                     UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28